# United States District Court
## Middle District of Florida
### Orlando Division

IN RE: SEMINOLE WALLS &
CEILINGS  CORP.,

                    **Debtor.**

  **Bankr. Case No. 6:01-bk-01966-KSJ**

_____/

DARTLIN J. AFRICH, AFRICH
MAINTENANCE, INC., AFRICH
MANAGEMENT & INVESTMENT, INC.,

                    **Appellants,**

-vs-

                            **Case No.  6:07-cv-1099-Orl-JA**
                        **Bankr. Adv. Proc. No. 6:04-ap-00077-KSJ**

CARLA MUSSELMAN, JOSEPH JASGUR,
VINTAGE PARTNERS, INC., GENE T.
CHAMBERS, FUNDING SOLUTIONS, INC.,
PITA CORPORATION, PAUL PHILIPSON,

                    **Appellees.**

_____       **Consolidated with**

DARTLIN J. AFRICH, AFRICH
MAINTENANCE, INC., AFRICH
MANAGEMENT & INVESTMENT, INC.,

                    **Appellants,**

-vs-

                            **Case No.  6:07-cv-1115-Orl-JA**
                        **Bankr. Adv. Proc. No. 6:04-ap-00079-KSJ**

CARLA MUSSELMAN, GENE T.
CHAMBERS, PITA CORPORATION,
PAUL PHILIPSON,

                    **Appellees.**

_____

**ORDER**

This matter is an appeal[1] from rulings in two bankruptcy court adversary proceedings following a bench trial.  Appellants are Dartlin J. Africh ("Mr. Africh"), Africh Maintenance, Inc. ("Africh Maintenance"), and Africh Management & Investment, Inc. ("Africh Management") (collectively, "the Africh Defendants").  Answer briefs have been filed by Appellees Joseph Jasgur ("Jasgur") (Doc. 50)[2] and Paul Philipson ("Philipson") (Doc. 49) only.

I.  Background[3]

To say that the facts relating to this bankruptcy case are convoluted would be a vast understatement.  The case was initiated on March 13, 2001, when the debtor, Seminole Walls & Ceilings Corporation ("SWC"), a drywall contractor, filed a voluntary petition for

---

[1]Initially, four appeals – Case Nos. 07-cv-1099, 07-cv-1115, 07-cv-1148, and 07-cv-1177 in this Court – were consolidated in a single case, with 07-cv-1099 as the lead case. (See Orders, Docs. 28 & 44).  However, the appeals in Case Nos. 07-cv-1148 and 07-cv-1177 have been voluntarily dismissed.  (See Docs. 53 & 54).  And, the appeals in Case Nos. 07-cv-1099 and 07-cv-1115 are from the same orders, entered separately in two adversary proceedings below.  Thus, there is in essence only one appeal involved here.  Another appeal, 07-cv-1050, is pending before this Court but has not been consolidated with this case.  (See Doc. 44 at 2 n.1).

[2]Citations to this Court's record in Case No. 07-cv-1099 are denoted by "Doc." followed by the location in the docket.  For the sake of clarity, the Court also provides, where applicable, parallel citations to the bankruptcy court's record, indicated by "B.R." followed by the number of the document.  Unless otherwise indicated, the "B.R." references are to the record in Adversary Proceeding 77 rather than in Adversary Proceeding 79 or the main bankruptcy case.

[3]The Background is taken largely from the Memorandum Opinion (Doc. 2-9, B.R. 278) entered on April 2, 2007 by the bankruptcy court.  The parties generally do not dispute the facts, and due to the voluminous record they, too, have cited the Memorandum Opinion when describing the proceedings below.  (See, e.g., Doc. 40 at 1 n.2).

reorganization under Chapter 11 of the bankruptcy code.  A Chapter 11 reorganization plan was confirmed in August 2002, but SWC did not make its payments to creditors as required by the plan, and upon motion by the United States Trustee, the case was converted to a Chapter 7 liquidation case on April 2, 2003; at that time, Carla Musselman ("the Trustee") was appointed as the Chapter 7 Trustee.

The Trustee learned that the bankruptcy estate might include an interest in a collection of photographs of celebrities, including Marilyn Monroe – formerly known as Norma Jean Dougherty.  The photographs were taken as long ago as the 1940s by Appellee Jasgur,[4] and the collection has been referred to by the parties as "the Jasgur Collection."  However, the composition of the Jasgur Collection – that is, what the collection consists of[5] – is in dispute, as is the ownership of it.  "[T]he parties all agree the collection is valuable, although an exact value is not easily ascertainable."  (Doc. 9-1, B.R. 160, at 3).

As noted in a Stipulation of Facts filed prior to trial, in its Chapter 11 Plan SWC indicated that it owned 100 percent of the stock of PITA Corporation ("PITA"), and PITA had allegedly purchased the Jasgur Collection.  (Stipulation of Facts, Jasgur's Ex. 65, ¶ 5).[6] According to the Plan, SWC intended to use proceeds from PITA's disposition of the Jasgur

---

[4]Jasgur was 87 years old at the time of the trial in September 2006.  In August 2005, a Florida probate court adjudicated Jasgur incapacitated and appointed Martin Stanonik as his guardian.  (See Jasgur's Ex. 12).

[5]The items involved include, among other things, photographs, negatives, photographic equipment, copyrights, and model release forms.

[6]Unless otherwise indicated, citations to exhibits are to those exhibits presented during the trial conducted by the bankruptcy court on September 13-15, 2006.

Collection "toward the implementation of the Plan of Reorganization." (Id.)  On March 31, 2003 – two days before SWC's case was converted to Chapter 7 – PITA purportedly sold the Jasgur Collection to Appellant Africh Maintenance via an "Asset Purchase Agreement" (Doc. 15-8).  The other two Africh Defendants – Mr. Africh and Africh Management – had earlier filed proofs of claim in the bankruptcy case based on loans they had made to SWC.

On April 2, 2004, the Trustee filed two adversary proceedings pertaining to the Jasgur Collection.  In Case No. 6:04-ap-00077-KSJ ("Adversary 77"), the Trustee sought to determine the bankruptcy estate's rights in the Jasgur Collection as against several other claimants thereto, including the Africh Defendants, Appellee Jasgur, PITA, and Appellee Philipson; Jasgur and Philipson had entered into agreements with regard to the Collection during the 1980s. (Compl. in Adversary 77, Doc. 3-1, B.R. 1).[7]  In Adversary 77, the Trustee asserted that any right that PITA has in the Jasgur Collection is part of SWC's bankruptcy estate, and the Trustee sought a declaration that SWC owns the Jasgur Collection free and clear of all liens and encumbrances.  (See id.)  In the second adversary proceeding, Case No. 6:04-ap-00079-KSJ ("Adversary 79"), which was filed against PITA and the Africh Defendants, the Trustee sought to recover the parts of the Jasgur Collection that were purportedly transferred on March 31, 2004.  (Second Am. Compl. in Adversary 79, Doc. 15-1, B.R. 54 in Adversary 79).[8]

---

[7]Philipson was not initially named as a Defendant in Adversary 77, but he was added later.  (See Second Am. Compl. in Adversary 77, Doc. 7-6, B.R. 79).

[8]The counts alleged in Adversary 79 include:  Count I – Alter Ego/Piercing the Corporate Veil, in which the Trustee asserted that PITA and SWC did not maintain separate existences and that PITA's corporate veil should be pierced; Count II – Consolidation of PITA

The bankruptcy court held a bench trial – having previously denied the Africh Defendants' requests for a jury trial – on September 13, 14, and 15, 2006 on only two issues: "(i) whether Jasgur ever effectively transferred any assets to PITA, and (ii) whether the Court should approve a settlement agreement between Jasgur and the Chapter 7 Trustee."[9] (Mem. Op., Doc. 2-9, B.R. 278, at 2-3).   "[A]ll other issues in th[e] adversary proceeding [were to] be decided later, to the extent the issues remain[ed] relevant."   (Id. at 3).   On April 2, 2007, the bankruptcy court issued its Memorandum Opinion addressing the two issues presented at trial.   With regard to the settlement rescission issue, the court agreed with Jasgur's contention that either party can rescind a settlement with a trustee prior to court approval of the settlement. (Id. at 34-37).   The Trustee has filed a separate appeal with regard to that ruling.[10]

The only other issue addressed at the trial was, as stated by the bankruptcy court, "whether Jasgur ever effectively transferred any assets to PITA."   (Id. at 3).   As the bankruptcy court notes in the Memorandum Opinion, some of the competing claims to the

---

with the bankruptcy estate; several counts seeking to avoid and set aside the March 31, 2004 transfer of the Jasgur Collection from PITA to Africh Maintenance; and Count X – Creation and Imposition of a Constructive Trust. (Second Am. Compl. in Adversary 79, Doc. 15-1, B.R. 54 in Adversary 79).

[9]The Trustee engaged in negotiations to attempt to resolve the competing claims to the Jasgur Collection, and she and Jasgur reached a settlement.   Due to similarities in issues regarding approval of the settlement and the adversary proceeding claims, the bankruptcy court "consolidated the issues regarding whether the settlement was fair and equitable with the trial of [the] adversary proceeding."   (Mem. Op. at 34).

[10]That appeal, Case No. 6:07-cv-1050, is also pending in this Court.   See n.1 supra. It will be addressed in a separate Order.

Jasgur Collection derive from PITA's alleged interest in it because they are based on transfers from PITA pursuant to various written agreements.  The court explains:

> [T]he ownership claims to the Jasgur Collection divide into those claims that arose *prior* to PITA's claims – those of Jasgur and Philipson – and those that arose *subsequently* and derive from PITA's interest – those of the [T]rustee and Africh.  The extent of PITA's interest in the Jasgur Collection then is a dividing line. For that reason, the Court bifurcated the issues raised.  The first portion of the trial addressed only two limited issues.  First, whether PITA ever, through any means, acquired any interest in the Jasgur Collection.  Second, whether the Court should approve the settlement between the [T]rustee and Jasgur.  The resolution of these issues then will dictate whether the [T]rustee ever obtained a legal interest in the Jasgur Collection and whether this Court ever needs to reach the other even more complicated issues raised in the adversary proceedings, such as what items are included in the Jasgur Collection, whether the interest acquired by Africh is avoidable as a fraudulent transfer, and the extent of the interest held by Philipson.

(Id. at 8-9) (footnote omitted).

The bankruptcy court first addressed Philipson's claim to the Jasgur Collection, specifically limiting its assessment to "whether Philipson held a 100 percent interest in the Jasgur Collection" (Id. at 9); if Philipson held a 100 percent interest, then Jasgur could not have later assigned an portion of the Collection to anyone else.  The court concluded that Philipson did not acquire a 100 percent interest in the Collection, though he may have a claim to part of it.  (Id.)

The court then turned to the issue of PITA's interest in the Jasgur Collection.  (Id. at 14).  As noted in the Memorandum Opinion, "PITA bases its ownership claims in the Jasgur

Collection on two grounds.  First, in early 2000, PITA signed two agreements with Jasgur[11] – a Purchase Agreement and Exclusive Marketing Agreement – which PITA asserts gave it ownership rights in the Jasgur Collection.  Second, in March 2000, PITA purchased items Jasgur had left in a rental unit in California from Joseph Yaron, the owner of the unit."  (Id.)

The bankruptcy court concluded that the first agreement between PITA and Jasgur – the Purchase Agreement signed January 6, 2000 – "simply conveyed to PITA a small, defined group of photos and letters of authenticity."  (Id. at 14-15).  The court further concluded that the second agreement – the Exclusive Marketing Agreement or "EMA" signed on February 1, 2000 – "did not convey any physical assets beyond those already conveyed under the Purchase Agreement, which were subsumed by the EMA.  Rather, as the very title of the EMA makes clear, the EMA simply gave PITA the exclusive right to market and to sell the Inventory for the benefit of the parties, and nothing more.  More significantly, the EMA transferred no intellectual property rights or any other type of ownership interest in the Jasgur Collection to PITA."  (Id. at 16).

"[S]eparate and apart from what PITA acquired by way of the Purchase Agreement and EMA, PITA purchased items Jasgur had stored in a rental unit in California from Joseph Yaron, who owned the rental unit" for $25,000.  (Id. at 16, 18).[12]  The court concluded that

---

[11]The agreements between Jasgur and PITA were entered into after Jasgur met Robert Fox – the general manager of SWC and the President of PITA – and Fox proposed marketing the Jasgur Collection.  (Mem. Op. at 14).

[12]In 1998, Yaron filed an unlawful detainer action in state court in California after Jasgur did not pay the rent for the storage unit, and the California "court entered a default judgment against Jasgur and granted Yaron a Writ of Possession to regain control over the unit and to dispose of the unit's contents."  (Mem. Op. at 17).  The Memorandum Opinion

the sale from Yaron to PITA "is valid and is not subject to avoidance at this point.  As such, PITA rightfully obtained possession of at least a portion of the Jasgur Collection, the California Assets.[13]   In addition, PITA obtained copies of photos under the Purchase Agreement, which it can sell.  However, under the EMA, PITA obtained no intellectual property rights or other ownership interest in the remainder of the Jasgur Collection." (Id. at 21).

The court then turned to the question of "whether PITA obtained any enforceable claim against Jasgur or to the Jasgur Collection that arose under the EMA." (Id.)  As the Memorandum Opinion explains:

> In this adversary proceeding, the issue is whether PITA, in addition to the California Assets or copies of photos supplied

------------------

explains:

> Yaron did not immediately dispose of Jasgur's items stored in the unit.  Rather, Yaron continued to call Jasgur to make arrangements for Jasgur to retrieve his property. Eventually, in early 2000, around the same time that PITA was still working collegially with Jasgur under the EMA, Jasgur told Fox about his problem and explained that he was about to lose the valuable personal property stored in Yaron's rental unit. Fox, believing the property indeed had value and was related to the items they were attempting to market under the EMA, immediately flew to California to buy the property from Yaron. . . . Jasgur was fully aware of the purpose of Fox's trip.  Indeed, Jasgur also traveled to California with Fox, specifically to assist him in negotiating the deal with Yaron.

(Id. at 18).

[13]Jasgur argued to the bankruptcy court that the sale from Yaron to PITA was not properly conducted under California law because no "public sale" occurred, but the court rejected Yasgur's contention in the Memorandum Opinion, finding that by participating in the sale Jasgur waived any right to attack it.  (Mem. Op. at 19).

-8-

under the Purchase Agreement [with Jasgur], obtained any claims or interests enforceable against Jasgur or the Jasgur Collection under the EMA as asserted in [a state court suit, referred to as "the Florida Litigation," in which PITA sued Jasgur shortly after the EMA was executed]. Jasgur asserts PITA obtained nothing under these agreements because, at the time these agreements were executed, PITA was a dissolved Texas corporation, unable to conduct business, and is unable to enforce any legal rights arising from these agreements, whether in this Court or in the Florida Litigation.

(Id. at 23).

Applying Texas law, the bankruptcy court concluded that "a corporation who forfeits its corporate charter is treated as a dissolved corporation and is allowed to wind-up its affairs but is not allowed to engage in any new business transactions." (Id. at 25). However, "Fox and PITA continued to enter into new business transactions, including those involving Jasgur and his photographs. The next inquiry then is whether PITA retained any rights or claims as a result of these improper actions." (Id. at 26). The bankruptcy court found that it did not. (Id.) The court concluded:

The effect of Texas'[s] corporation law is to forever extinguish any claims PITA may arguably hold against Jasgur or anyone else, regardless of the underlying validity of the claims, if the claims arose after February 12, 1999. Here, PITA entered into all of the relevant agreements, the Purchase Agreement and EMA with Jasgur and the [Asset Purchase Agreement] and Termination Agreement with Vintage Partners/Collections, Inc., after February 12, 1999. The claims did not exist on the date that PITA forfeited its charter and became a dissolved corporation. As such, the claims, whatever they were, are forever extinguished. PITA has no enforceable claims arising under the Purchase Agreement, the EMA, or the APA.
PITA's sole claim to the Jasgur Collection, therefore, rests on its physical possession of the California Assets and any photos PITA received under the Purchase Agreement. Article 7.12A(3) of the Texas Business Corporation Act allows a

> dissolved corporation to collect these assets after dissolution for liquidation.  If the physical assets are not liquidated during the three-year wind-up period, the corporation's shareholders, here the debtor, Seminole Walls, Inc., or now, its Chapter 7 trustee, must complete the liquidation.
>
> In summary, PITA can only liquidate physical assets in its possession and cannot pursue any claim arising after February 12, 1999.  The Court holds that the only portion of the Jasgur Collection which PITA or its later assignees, such as the chapter 7 trustee or Africh, can assert any right to control is the California Assets and any photos transferred under the Purchase Agreement, nothing more.  Any other rights or claims PITA ever held against Jasgur or the Jasgur Collection are forever extinguished.

(Id. at 27-28) (citations omitted).

The same day that the Memorandum Opinion was entered, the bankruptcy court entered a "Partial Final Judgment" providing in part that "PITA Corporation holds and the [Trustee] may liquidate any portion of the California Assets and any photos copied under the Purchase Agreement with Jasgur" and that "PITA otherwise is unable to assert any claim or interest against Jasgur, to the Jasgur Collection, or otherwise arising after February 12, 1999." (Doc. 12-1, B.R. 279).  On April 18, 2007, the bankruptcy court entered an "Amended Partial Final Judgment" removing the language regarding liquidation by the Trustee and stating that "[n]o sale of these assets can occur without further court approval." (Doc. 2-10, B.R. 292).

In this appeal, the Africh Defendants raise four issues:  whether the bankruptcy court erred (1) in concluding that they waived their right to a jury trial; (2) "in holding that PITA is unable to assert any claim or interest against the . . . Collection, arising after February 12, 1999" – the day PITA was dissolved; (3) "in holding that the [Trustee] holds a superior

interest in the . . . Collection"; and (4) "in holding that the [Trustee] is now permitted to liquidate any assets which make up the . . . Collection."  (Doc. 40 at 1).

## II.  Jurisdiction

Before turning to the merits of the appeal, two jurisdictional issues must be addressed. One pertains to the bankruptcy court's jurisdiction and the second, to the jurisdiction of this Court.

### A.  Jurisdiction of the Bankruptcy Court

First, there is an issue regarding the bankruptcy court's jurisdiction to enter the Amended Partial Final Judgment on April 18, 2007.  Although this question is not squarely presented by any of the parties, it is mentioned in a footnote to the Africh Defendants' Initial Brief (see Doc. 40 at 1 n.1) and indeed is not inconsequential.

As earlier noted, the bankruptcy court entered its memorandum opinion (Doc. 2-9, B.R. 278) and Partial Final Judgment (Doc. 12-1, B.R. 279) on April 2, 2007.  The Africh Defendants filed their Notice of Appeal (Doc. 12-3, B.R. 283) on April 11, 2007.  Seven days later, on April 18, 2007, the bankruptcy court entered the Amended Partial Final Judgment (Doc. 2-10, B.R. 292).  This Amended Partial Final Judgment was entered after a hearing was held that same day on a Motion for Stay Pending Appeal (Doc. 12-8, B.R. 285) filed by the Africh Defendants.  During that hearing, counsel for Jasgur expressed doubt about the bankruptcy court's jurisdiction to amend the judgment at that point (see Hr'g Tr. 04/18/2007, Doc. 25-3, B.R. 311, at 17-18), and this concern was well-founded.

Once the Africh Defendants filed their notice of appeal, the bankruptcy court lost

jurisdiction to enter rulings modifying the judgment on appeal. See, e.g., Walden v. Walker (In re Walker), 515 F.3d 1204, 1211 (11th Cir. 2008) ("The filing of a proper notice of appeal is an event of jurisdictional significance – it confers jurisdiction on the appellate court and divests the trial court of its control over those aspects of the case involved in the appeal."). "The bankruptcy court retains jurisdiction over all other matters that it must undertake 'to implement or enforce the judgment or order,' although it 'may not alter or expand upon the judgment.'" Sherman v. SEC (In re Sherman), 491 F.3d 948, 967 (9th Cir. 2007) (quoting Neary v. Padilla (In re Padilla), 222 F.3d 1184, 1190 (9th Cir. 2000)). The Amended Partial Final Judgment clearly "alters or expands upon" the initial Partial Final Judgment, and thus the bankruptcy court lacked jurisdiction to enter it. The latter order is therefore void. See In re Padilla, 222 F.3d at 1190 (noting that where bankruptcy court lacked jurisdiction to proceed during pendency of appeal, bankruptcy court's order entered after notice of appeal was filed was "null and void"). Thus, the bankruptcy court lacked the power to amend the judgment. The initial Partial Final Judgment – but not the Amended Partial Final Judgment – will be reviewed herein.[14]

---

[14]Although the Africh Defendants filed a second notice of appeal (Doc. 2-2, B.R. 304) after the Amended Final Judgment was entered, that filing does not cure the problem with the bankruptcy court's lack of jurisdiction to amend the Partial Final Judgment. If the Africh Defendants had filed a motion to amend the judgment within ten days of April 2, 2007, the bankruptcy court could have properly amended the judgment and the Africh Defendants could have instituted their appeal thereafter. See Fed. R. Bankr. P. 8002(b) (providing that "[i]f any party makes a timely motion of a [certain specified] type," including a motion to alter or amend judgment, "the time for appeal for all parties runs from the entry of the order disposing of the last such motion outstanding"). However, the Africh Defendants did not file such a motion, and the bankruptcy court lost jurisdiction to amend the Partial Final Judgment when they filed their first notice of appeal on April 11, 2007. The Africh Defendants did file a Motion for Stay Pending Appeal (Doc. 12-8, B.R. 283), but that motion is not one of the

B.  This Court's Jurisdiction

Second, the issue of this Court's subject matter jurisdiction over this appeal must be addressed.  The orders appealed – the Partial Final Judgment, the Memorandum Opinion, and the Orders Denying Requests for Jury Trial – are not plainly final in nature.  This Court ordered further briefing on this issue, and the parties have submitted a Joint Memorandum Regarding Statement of Jurisdiction (Doc. 57).  As noted in that Joint Memorandum (Doc. 57 at 8), courts have held that an order approving the sale of property of the estate is a final appealable order.  See, e.g., In re Sax, 796 F.2d 994, 996 (7th Cir. 1986) ("Orders approving or failing to approve the sale of a debtor's property are considered final decisions and are immediately appealable.").  The Partial Final Judgment does approve the sale of estate property.  (See B.R. 279 at 2 ¶ 2 ("PITA Corporation holds and the [Trustee] may liquidate any portion of the California Assets and any photos copied under the Purchase Agreement with Jasgur.")).  Thus, this Court concludes that the Partial Final Judgment qualifies as a final appealable order and that under 28 U.S.C. § 158(a)(1),[15] this Court has jurisdiction to review

---

types of motions specified in Rule 8002(b).  And, although the matter of altering the judgment was discussed at the hearing on the motion for stay pending appeal and could be construed as an oral motion to amend, that hearing was held on April 18, 2007 – more than ten days after the entry of judgment; thus, any such oral motion was untimely.

[15]In any event, even if the appealed orders are not final orders, they are appropriately reviewed as appealable interlocutory orders.  "While final orders of the bankruptcy court may be appealed to the district court as of right, see 28 U.S.C. § 158(a)(1), appeals from nonfinal bankruptcy court orders may be taken only 'with leave' of the district court, see id. § 158(a)(3)."  In re Orange Boat Sales, 239 B.R. 471, 473 (S.D.N.Y. 1999) (footnote omitted).  "Where no motion for leave to appeal is filed where one is required, a notice of appeal may be treated as a motion for leave to appeal. Fed. R. Bankr. P. 8003(c); see also Wilborn v. Gallagher (In re Wilborn), 205 B.R. 202, 206 (B.A.P. 9th Cir. 1996) ("Neither party moved for leave to appeal; however, the Panel has authority under Fed. R. Bankr. P. 8003 to treat a

it and the other orders appealed.[16]

### III.  Standard of Review

In reviewing a decision of a bankruptcy court, "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Fed. R. Bankr. P. 8013.  However, a district court reviews the bankruptcy court's conclusions of law de novo.  See, e.g., Schlein v. Mills (In re Schlein), 8 F.3d 745, 747 (11th Cir. 1993).  Thus, this Court "'freely examines the applicable principles of law to see if they were properly applied and freely examines the evidence in support of any particular finding to see if it meets the test of substantiality.'"  Club Assocs. v. Consol. Capital Realty Investors (In re Club Assocs.), 951 F.2d 1223, 1228-29 (11th Cir. 1992) (quoting Southtrust Bank of

---

Notice of Appeal as a Motion for Leave to Appeal."); In re Orange Boat Sales, 239 B.R. at 473.  "The decision to grant or deny leave to appeal a bankruptcy court's interlocutory order is committed to the district court's discretion."  In re O'Connor, 258 F.3d 392, 399-400 (5th Cir. 2001).  In exercising that discretion, "a district court will look to the standards which govern interlocutory appeals from the district court to the court of appeals pursuant to 28 U.S.C. § 1292(b)."  Celotex Corp. v. AIU Ins. Co. (In re Celotex Corp.), 187 B.R. 746, 749 (M.D. Fla. 1995).  "Under these standards, a court will permit an interlocutory appeal of an order if (1) the order presents a controlling question of law (2) over which there is substantial ground for difference of opinion among courts, and (3) the immediate resolution of the issue would materially advance the ultimate termination of the litigation." Id.  These elements are satisfied here, and thus review of the appealed orders is appropriate even if they are not "final."

[16]The Africh Defendants previously attempted to appeal the denial of their request for a jury trial.  This Court denied their request for leave to appeal.  (See Doc. 9-8, B.R. 225).  However, now that the Partial Final Judgment has been entered and determined to qualify as a "final order" as set forth in the text, the jury trial ruling is also appropriately reviewed at this time.

-14-

Ala., N.A. v. Thomas (In re Thomas), 883 F.2d 991, 994 (11th Cir. 1989)).  The parties agree

that this appeal presents only issues of law, and thus the de novo standard applies.

## IV.  Discussion

### A.  Right to Jury Trial

The Africh Defendants first challenge the bankruptcy court's conclusion that they[17] are

not entitled to a jury trial.  The court found that the Africh Defendants had a right to jury trial

but waived it – Mr. Africh and Africh Management by filing proofs of claim in the bankruptcy

case, and Africh Maintenance by imputation of Mr. Africh's waiver pursuant to the alter ego

doctrine.  The Africh Defendants contend that the proofs of claim filed by Mr. Africh and

Africh Management did not waive their right to a jury trial with regard to the Jasgur Collection

because those proofs of claim were related not to the Collection but to loans of money they

had made to SWC.  Additionally, the Africh Defendants contend that Africh Maintenance –

which did not file a proof of claim – should not have Mr. Africh's waiver imputed to it.

The Supreme Court has addressed the jury trial rights of bankruptcy creditors.  In

Granfinanciera, S.A. v. Norberg, 492 U.S. 33, 36 (1989), the Court held that "a person who

has not submitted a claim against a bankruptcy estate has a right to a jury trial when sued

_____

[17]Philipson and PITA Corporation also demanded a jury trial, and their requests were
denied in the same orders in which the Africh Defendants' request was denied.  These other
denials have not been appealed, however.  The bankruptcy court explains in one of its
orders:  "Paul Philipson demanded a jury trial but advised the Court that, if the jury trial
demand was denied as to the other defendants, he would agree to have the matter heard
without a jury.  Philipson did not separately argue for a right to a jury trial.  He simply wants
a trial combined with the other defendants as soon as possible, regardless of whether the
jury or the Court decides the issues."  (Doc. 9-1, B.R. 160, at 2 n.2).

by the trustee in bankruptcy to recover an allegedly fraudulent monetary transfer."  The next year, the Court held that where creditors filed claims against the bankruptcy estate, they "thereby br[ought] themselves within the equitable jurisdiction of the Bankruptcy Court" and therefore "were not entitled to a jury trial on the trustee's preference action."  Langenkamp v. Culp, 498 U.S. 42, 45 (1990).  Quoting Granfinanciera, the Langenkamp Court stated, "'a creditor's right to a jury trial on a bankruptcy trustee's preference claim depends upon whether the creditor has submitted a claim against the estate.'"  Id.

Courts have interpreted this Supreme Court precedent as meaning that a creditor waives his right to a jury trial by filing a claim in the bankruptcy court, but only to the extent that "the dispute [is] part of the claims-allowance process or affect[s] the hierarchical reordering of creditors' claims."  Germain v. Ct. Nat'l Bank, 988 F.2d 1323, 1330 (2d Cir. 1993); accord Dunmore v. United States, 358 F.3d 1107, 1116 (9th Cir. 2004).  Other courts have couched the extent of the waiver in terms of whether the issue on which a jury trial is sought relates to the proof of claim that was filed.  See Rebein v. Kost, Civ. Action No. 06-204-CM, 2006 WL 3842124, at *2 (D. Kan. Nov. 3, 2006) (concluding that where defendants filed claims against the bankruptcy estate, they were "not entitled to a jury trial on the claims filed in the bankruptcy court that relate to their proofs of claim"); R & F Intellectual Prop. Acquisition, Inc. v. Hantover, Inc. (In re Dynamic Tooling Sys., Inc.), Case No. 04-15900, Adv. No. 06-5476, 2007 Bankr. LEXIS 2090, at *18-19 (Bankr. D. Kan. June 12, 2007) ("By filing a proof of claim, [the defendant] has subjected itself to the court's jurisdiction, but not necessarily for every purpose. . . . What must be determined . . . is whether the claims asserted by [the defendant] in its proof of claim are so closely related to the subject matter

-16-

of the claims raised by [the plaintiff] in its complaint that [the defendant] has waived its jury trial rights.").

In the case at bar, the bankruptcy court held an evidentiary hearing regarding the Africh Defendants' jury trial requests (see Hr'g Tr. 11/10/2005, Docs. 25-1 & 25-2, B.R. 153) and thereafter entered two orders (Doc. 9-1, B.R. 160 & Doc. 2-8, B.R. 168) denying the requests.  After noting that the Africh Defendants "timely demanded a jury trial," (B.R. 160 at 2), the bankruptcy court explained its reasons for finding waiver, recounting in detail the facts surrounding the filings of the proofs of claim and their relationship to the Jasgur Collection.

The court found that "Africh Maintenance's possible purchase of the Jasgur Collection directly relates to the allowance or disallowance of the claims filed by [Mr.] Africh and [Africh Management] in the debtor's bankruptcy." (B.R. 160 at 6).  The court noted that in the Asset Purchase Agreement between PITA and Africh Maintenance, part of the consideration paid by Africh Maintenance was "release of the claims filed in the bankruptcy case by [Mr. Africh] and [Africh Management]," id.  The court ultimately concluded that Mr. Africh and Africh Management "voluntarily submitted to the equitable jurisdiction of the bankruptcy court" by filing their proofs of claim and that those proofs of claim "directly relate to the asset in dispute in this litigation – the Jasgur Collection."  (B.R. 160 at 11).

Although the Africh Defendants now argue that "[n]one of the Trustee's allegations [in the adversary proceedings] relate to the money loaned to the Debtor" and that therefore their proofs of claim cannot constitute a waiver of their jury trial right, (Doc. 40 at 17), they do not specifically address or challenge the bankruptcy court's conclusions regarding the connection

between the PITA-Africh Maintenance purchase agreement and the forgiveness of the debt evidenced by the earlier-filed proofs of claim.  This Court agrees that, under the unique circumstances of this case and in light of the significant relationship between the asset at issue in the subject adversary proceedings and the debt to which the proofs of claim pertain, the filing of the proofs of claim constituted a waiver of whatever jury trial right Mr. Africh and Africh Maintenance had.[18]

The Court also agrees that Mr. Africh's waiver is properly imputed to Africh Maintenance under the alter ego doctrine.  The Africh Defendants seemingly do not challenge the bankruptcy court's factual finding that Africh Maintenance is the alter ego of Mr. Africh; they instead contend that a jury trial waiver should not be imputed.  Even if the Africh Defendants had challenged the alter ego finding, that challenge would be rejected in light of Mr. Africh's own testimony at the November 10, 2005 evidentiary hearing and the fact that the check for Africh Maintenance's purchase of the Jasgur Collection from PITA came from Mr. Africh's personal account.  Mr. Africh's waiver of his jury trial right is properly imputed to Africh Maintenance, which is merely his alter ego.  See, e.g., Official Creditors Comm. v. Bryan (In re Legacy Estate Group), No. 05-14659, Adv. No. 06-1173, 2007 WL 2908280, at *1 (Bankr. N.D. Cal. Sept. 28, 2007) (noting district court's directive that "[t]o the extent that the bankruptcy court decides that the JFB Trust does indeed constitute an alter ego of Bryan and/or the JMB Trust [who had filed claims in the bankruptcy], then JFB Trust,

_____

[18]No one has challenged the bankruptcy court's conclusion that some of the Trustee's claims against the Africh Defendants in the adversary proceedings are legal claims on which they had a jury trial right. (See B.R. 160 at 10).  The Court does not review that determination here; the only issue presented here is waiver.

in addition to Bryan and JMB Trust, will have waived [its] jury trial right").  The bankruptcy court's determination that the Africh Defendants waived their jury trial right is therefore affirmed.

### B.  PITA's Dissolution

The Africh Defendants next argue that the bankruptcy court erred in concluding that PITA "is unable to assert any claim or interest against [Jasgur, to the Jasgur Collection,] or otherwise arising after February 12, 1999."  (Doc. 40 at 20 (quoting the Partial Final Judgment)).  Their argument in this regard is two-pronged.  First, the Africh Defendants contend the court erred in addressing the effect of PITA's dissolution at all because, they assert, a Florida state court already ruled on that question; thus, the Africh Defendants argue, the bankruptcy court was precluded from revisiting that issue.  Second, the Africh Defendants argue that the bankruptcy court erred in applying the terms of the Texas Business Corporation Act to find that PITA could not assert any claims to the Collection arising after its dissolution on February 12, 1999.

### 1.  The Effect of the State Court Litigation

Relying on res judicata, the <u>Rooker</u>-<u>Feldman</u>[19] doctrine, and the law-of-the-case doctrine, the Africh Defendants first contend that "the Bankruptcy Court is required to uphold the findings of the court in the Florida Litigation, which held that Jasgur was liable under the EMA."  (Doc. 40 at 24).  They assert that thus "PITA has [a] valid interest and claims under

---

[19]<u>See</u> <u>Rooker v. Fid. Trust Co.</u>, 263 U.S. 413, 415-16 (1923); <u>D.C. Ct. of Appeals v. Feldman</u>, 460 U.S. 462, 476-82 (1983).

the EMA to the Collection." (Id.)  However, Appellees correctly assert, and the bankruptcy court correctly found, that nothing occurred in the state court litigation that has the preclusive effect urged by the Africh Defendants.

The state court litigation upon which the Africh Defendants rely was a suit initiated by PITA against Jasgur in early 2000[20] to enforce the terms of the EMA, under which Jasgur was allegedly not performing.  In October 2000, Jasgur filed an Answer and Affirmative Defenses to PITA's complaint, raising, inter alia, the affirmative defenses that PITA was barred from bringing an action in Florida because it was not in good standing in Texas and that the EMA was voidable because PITA was not authorized to transact business at the time it was executed.  (Answer and Aff. Defenses in state court suit, Jasgur's Ex. 37).

In November 2000, however, PITA entered into an Asset Purchase Agreement with another entity, Vintage Partners, Inc., in which PITA purported to transfer the Collection to Vintage and also assigned its rights in the Florida litigation to Vintage.  Vintage then filed an Intervenor's Complaint in the Florida litigation, and Jasgur, who was represented by counsel, did not respond to the Intervenor's Complaint.[21]  Vintage moved for entry of default judgment, and the state court granted that motion in an order stating:

> 1.  Intervenor Plaintiff's Motion for Entry of Default Final Judgment as to liability is GRANTED, and
> 2.  Intervenor Plaintiff shall set an Evidentiary Hearing to determine the remedy or remedies to be chosen, the specific

---

[20]*PITA Corp. v. Joseph Jasgur and Debbie Jasgur*, Case No. CIO 00-1642, in the circuit court of the Ninth Judicial Circuit in and for Orange County, Florida.

[21]There is some suggestion in the record that Jasgur's then-counsel "disappeared" around that time.

> items in the Jasgur Collection for which relief is sought, and the
> amount of damages sought.

(State court order dated May 16, 2002, Jasgur's Ex. 60).  It is this order that the Africh

Defendants contend bars the bankruptcy court from considering matters such as PITA's

corporate status that were raised by Jasgur as affirmative defenses in state court.

"No order may be res judicata as to a subsequent case unless it is a final judgment

which disposes of the controversy in the first one."  Donnell v. Indus. Fire & Cas. Co., 378

So. 2d 1344, 1346 (Fla. 3d DCA 1980).  This state court order is not a final order, and thus

it cannot serve as a basis for res judicata.  See id. ("[I]t is settled by a veritable host of Florida

authorities that an order, like this one, which merely grants a motion and does not go further

and actually dismiss the complaint, the cause, or a party, or enter judgment for the movant

is nothing more than an interlocutory one which cannot provide the foundation for a claim of

res judicata.") (footnote omitted).  The order merely grants a motion and does not dispose

of the case; it called for an evidentiary hearing, which by all accounts was never set.  Res

judicata did not bar consideration of PITA's corporate status by the bankruptcy court.

The Rooker-Feldman doctrine precludes federal courts from reviewing decisions of

state courts.  Lance v. Dennis, 546 U.S. 459, 463 (2006).  Like res judicata, however, this

doctrine does not come into play in the absence of a final judgment.  See, e.g., Amos v.

Glynn County Bd. of Tax Assessors, 347 F.3d 1249, 1265 n.11 (11th Cir. 2003) (listing four

criteria for application of the Rooker-Feldman doctrine, one of which is that "the prior state

court ruling was a final or conclusive judgment on the merits").  Thus, the Rooker-Feldman

doctrine also did not bar the bankruptcy court from considering PITA's corporate status.

Finally, Appellees are correct that the "law of the case" doctrine does not apply either. This "doctrine applies only to rulings on questions of law that were actually presented and considered in a prior *appeal*." DeMartino v. Simat, 948 So. 2d 841, 843-44 (Fla. 2d DCA 2007). The state circuit court proceeding was not an appellate proceeding.

In sum, none of the doctrines relied upon by the Africh Defendants supports their argument that the bankruptcy court could not consider PITA's dissolved status or the effect thereof. The court correctly concluded that the state court's order was not final and did not bar consideration of the issue.

### 2.  The Texas Business Corporation Act

The Africh Defendants next contend that the bankruptcy court erred in its application of the Texas Business Corporation Act and in its conclusions that "[t]he effect of Texas'[s] corporation law is to forever extinguish any claims PITA may arguably hold against Jasgur or anyone else, regardless of the underlying validity of the claims, if the claims arose after February 12, 1999" and that "PITA has no enforceable claims arising under the Purchase Agreement, the EMA, or the APA." (See Doc. 40 at 25 (quoting Mem. Op. at 27-28)). They argue that the cases upon which the court relied are distinguishable because they pertain to liability of dissolved corporations; the Africh Defendants contend that "[u]nlike the cases cited by the bankruptcy court, PITA entered into a series of contracts for the purchase and sale of the Collection post-dissolution" and "[t]he issues tried . . . had nothing to do with lawsuit[s] or claims that PITA asserted or did not assert." (Doc. 40 at 26). They further contend that PITA could engage in business even after its dissolution so long as it was not the business for which PITA was organized.

Although this Court does not necessarily agree with all of the Africh Defendants'

contentions, it does agree that the bankruptcy court's reasoning with regard to the extent of

PITA's interest in the Jasgur Collection is difficult to follow.  In the Memorandum Opinion, the

court, after concluding that the sale from Yaron to PITA of the California Assets was "valid

and . . . not subject to avoidance at this point" (Mem. Op. at 21), noted that PITA had

forfeited its charter on February 12, 1999 and thus it "is and has been a dissolved Texas

corporation for many years," (id. at 24).  The court then determined that PITA cannot assert

any claims arising from the Purchase Agreement and EMA it entered into with Jasgur in early

2000 or the Asset Purchase Agreement and Termination Agreement it entered into with

Vintage Partners later that year.  The court found that "[t]he claims [under these agreements]

did not exist on the date that PITA forfeited its charter and became a dissolved corporation."

(Id. at 28).  The court summarized:

> PITA's sole claim to the Jasgur Collection, therefore, rests
> on its physical possession of the California Assets and any
> photos PITA received under the Purchase Agreement.  Article
> 7.12A(3) of the Texas Business Corporation Act allows a
> dissolved corporation to collect these assets after dissolution for
> liquidation. . . .
> In summary, PITA can only liquidate physical assets in its
> possession and cannot pursue any claim arising after February
> 12, 1999.  The Court holds that the only portion of the Jasgur
> Collection which PITA . . . can assert any right to control is the
> California Assets and any photos transferred under the Purchase
> Agreement, nothing more.  Any other rights or claims PITA ever
> held against Jasgur or the Jasgur Collection are forever
> extinguished.

(Id.)

The agreement that PITA entered into with Yaron for the purchase of the California

Assets was entered into after PITA's dissolution on February 12, 1999, yet the Court found that sale valid.  It is not clear whether this conclusion was based on the fact that Jasgur – whom the Court found participated and cooperated in that sale – was seeking to challenge the sale rather than Yaron.  However, the Court also found that PITA has rights to photos it acquired from Jasgur under the Purchase Agreement with him, and that Agreement was also entered into after PITA's dissolution.  The court then found that PITA could not assert any "claim" beyond the items in its physical possession.  The bankruptcy court seemingly made a distinction between physical assets in PITA's possession on the one hand and rights or claims that PITA might have on the other.

The basis of the bankruptcy court's distinction is not clear.  Did it find that a dissolved Texas corporation can acquire physical assets after its dissolution but not "claims" or "rights" to property?  The Appellees assert in their Answer Briefs that the bankruptcy court correctly found that a dissolved corporation could "hold and liquidate assets that remained in the dissolved corporation's possession or that are collected after dissolution."  (Doc. 50 at 15). However, the Texas statute cited by Appellees provides that a dissolved corporation may continue to act for the purpose of "holding title to and liquidating any properties or assets that *remained in the dissolved corporation at the time of*, or are *collected by the dissolved corporation after, dissolution.*"  Tex. Bus. Corp. Act. art. 7.12(A)(3) (Vernon) (emphasis added).  Here, the assets were not "in the dissolved corporation at the time of dissolution" – they were not acquired until 2000.  And,"collected by the corporation after dissolution" would not seem equivalent to "acquired by the corporation" after dissolution. Yet, this is what Appellees argue for and what the bankruptcy court seemingly found.

In any event, this Court makes no rulings on these issues at this time.  The Court does

conclude, however, that the bankruptcy court's decision regarding what parts of the Jasgur

Collection PITA could acquire, did acquire, and why, is not clear, and meaningful review of

this ruling is not possible.  Due to the multiple claimants who assert an interest through PITA,

the extent of PITA's acquisitions and the quality of PITA's title to whatever it did acquire

appear to be crucial issues in this case.  Therefore, the bankruptcy court's rulings in this

regard are vacated and the case will be remanded for further proceedings anew regarding

the extent of PITA's interest.

C.  Ruling as to the Trustee's Interest in the Jasgur Collection

The Africh Defendants also contend that the bankruptcy court prematurely determined

that the Trustee has rights in the Collection because the trial was – as noted by the

bankruptcy court itself – specifically limited to only two issues:  (1) whether the settlement

agreement between Jasgur and the Trustee should be approved; and (2) "whether PITA

ever, through any means, acquired any interest in the Jasgur Collection."  (Mem. Op. at 9;

see also id. at 3 (describing the latter issue as "whether Jasgur ever effectively transferred

any assets to PITA")).  The Africh Defendants argue that the bankruptcy court exceeded the

declared scope of the trial by touching on issues related to piercing PITA's corporate veil and

whether SWC and PITA can be substantively consolidated.

Appellees have not responded to this argument, and the Court finds it well-taken.  In

the Memorandum Opinion and the Partial Final Judgment, the bankruptcy court did go

beyond the scope of the limited issues tried.  The question of whether PITA's assets are part

of the bankruptcy estate of its shareholder, SWC, has not yet been expressly determined, but in the appealed rulings the bankruptcy court implicitly makes the leap from PITA's ownership to the estate's contents.  (See, e.g., Partial Final Judgment at 2 (stating that "PITA Corporation holds and the [Trustee] may liquidate any portion of the California Assets").  The rulings beyond the issues noticed and the evidence presented at trial were not proper, and they are vacated.

### D.  Ruling as to Liquidation

Finally, the Africh Defendants contest the language in the Partial Final Judgment that allows the Trustee to liquidate part of the Collection.  They note that they make this argument out of an abundance of caution in the event that this Court reviews the Partial Final Judgment – which does contain this language – instead of the Amended Partial Final Judgment, which does not.  As noted earlier, this Court *is* reviewing the Partial Final Judgment rather than the Amended Partial Final Judgment due to the bankruptcy court's lack of jurisdiction to enter the Amended Partial Final Judgment.  This argument is well-taken; the bankruptcy court should not have made a ruling as to the Trustee's right to liquidate any part of the Collection because the estate's interest in the Collection has not yet been determined.  This ruling is also vacated.

### V.  Conclusion

For the reasons stated herein, the rulings of the bankruptcy court are **AFFIRMED in part** and **VACATED in part**.  This case is **REMANDED** to the bankruptcy court for further

proceedings consistent with this opinion.

**DONE** and **ORDERED** in Chambers, Orlando, Florida this 27th day of March, 2008.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Party